UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

RODNEY ROGERS

                          Plaintiff,

              v.

OREGON TRAIL ELECTRIC
CONSUMERS COOPERATIVE, INC., a
domestic non-profit cooperative

                          Defendant.

Case No.: 3:10-CV-1337-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Introduction*

        Plaintiff Rodney Rogers ("Rogers") filed this suit against Oregon Trail Electric Consumers

Cooperative, Inc. ("OTEC") alleging employment discrimination.  Specifically, Rogers alleges: (1)

OTEC discriminated against him on the basis of age in violation of the Age Discrimination in

Employment Act ("ADEA") and Oregon state law; (2) OTEC retaliated against him in violation of

Page 1 - OPINION AND ORDER                                                          {RMD}

the Family and Medical Leave Act ("FMLA") and the Oregon Family Leave Act ("OFLA"); and (3) OTEC discriminated against him in violation of the Americans with Disabilities Act ("ADA") and Oregon state law.[1]

This court has federal question subject matter jurisdiction under 28 U.S.C.§ 1331 to hear Rogers's claims under federal statutory law. This court also has supplemental jurisdiction over Rogers's state law claims pursuant to 28 U.S.C. § 1367, as the state law claims arise out of the same nucleus of operative fact as his federal claims.

OTEC now seeks summary judgment on all three of Rogers's claims. Rogers, in response, opposes the motion and separately moves to strike selected portions of the evidentiary record. For the reasons set forth below, OTEC's motion is granted in part and denied in part, and Rogers's motion to strike is granted in part and denied in part.

*Background*

I. Factual Background

OTEC is a non-profit electric cooperative with its principal place of business in Baker City, Oregon. OTEC also has offices in La Grande, John Day, and Burns, Oregon – one for each district that OTEC services. Ray Decl. ¶2. The policies at OTEC are created by a board of directors ("the Board"). Ray Decl. ¶ 2. The highest-ranking employee at OTEC is the general manager, who is in charge of day-to-day management. Ray Decl. ¶ 3. Reporting to the general manager is the operations manager, who is in charge of business operations at OTEC. Ray Decl. ¶ 4.

Rogers is a 65-year-old Oregon resident formerly employed by OTEC. Rogers Dep. 11:13-

---

[1]Rogers now asserts on summary judgment that he is pursuing an interference claim. This shift of his family leave claim is addressed later in this opinion.

14, 14:3-6, Aug. 31, 2011. Rogers was hired in 2002 to be OTEC's Baker District line superintendent ("Superintendent position") by then-General Manager Cliff Stewart ("Stewart") and then-Operations Manager Ken Kissell ("Kissell"). Rogers Dep. 13:25-14:6.

At the time Rogers was hired, there was one District Line Supervisor in each of the four districts that OTEC services (Baker, La Grande, John Day, and Burns). Ray Decl. ¶ 6. The Superintendent is charged with, among other things, determining the manpower and equipment required for each project, supervising the workers who complete those projects, and coordinating construction work with state agencies and other companies. Ray Decl. ¶ 6.

In 2005, the Board selected Rogers as the Employee of the Year because he "took charge" after he was hired. Rogers Decl. ¶ 2. Two years later, however, Rogers was terminated by Stewart and Kissell, allegedly because they were dissatisfied with Rogers's job performance. Rogers Dep. 220:2-15. Before he was fired, Rogers reported to the Board that Kissell and Stewart had been contracting out jobs that OTEC could have performed at a lower cost to the company. Rogers Dep. 220:2-15. Soon, Kissell and Stewart began finding insufficiencies in Rogers's work, leading to his termination. A week after Rogers was terminated, the board reinstated Rogers and fired Stewart. Rogers Dep. 220:2-15.

The Board hired Werner Buehler ("Buehler") to be OTEC's new general manager. Ray Decl. ¶ 3. In February, 2008, Kissell gave Rogers a positive performance review, and, after an investigation by an attorney into Rogers's 2007 termination, Buehler awarded Rogers a 13% raise and a lump sum payment as compensation for raises Rogers should have received while Stewart was general manager. Lloyd Aff. Ex. J, K. Also in February 2008, Kissell resigned his position and OTEC hired Bill Butner ("Butner") as interim operations manager. Lloyd Aff. Ex. L; Buehler Dep.

25:15-20, Sept. 1, 2011.  Later, Jim Putman ("Putman") was hired as the permanent operations manager, and Buehler hired Debby Ray ("Ray") to fill the newly created human resources manager position.  Buehler Dep. 28:3-5, 24:23-25:4

For a brief period in 2008, Rogers was the superintendent for both the Baker District and John Day District.  Rogers Dep. 29:12-16.  Putman told Rogers he was offered the position because of his experience and knowledge of OTEC operations.  Rogers Decl. ¶ 4.  Rogers accepted the position initially, but later declined because the compensation was not acceptable to him and his work was suffering as a result of trying to cover both districts.  Rogers Dep. 29:15.

Early in 2009, Putman was scheduled to issue Rogers a performance review.  Rogers Decl. ¶ 8.  Putman did not issue a formal written review, but the two met informally to discuss Rogers's performance.  Rogers Decl. ¶ 8.  At the meeting, Putman expressed general satisfaction with Rogers's work, though he noted Rogers "dropped the ball a little" while covering both Baker and John Day Districts.  Rogers Decl. ¶ 8.  Further, Putman told Rogers that his computer skills were not very good, and could use improvement.  Rogers Decl. ¶ 8.  Rogers acknowledged that these were fair criticisms.  Rogers Decl. ¶ 8.

Rogers suffers from deep vein thrombosis, causing blood clots throughout his body, and degenerative joint disease, or osteoarthritis, that causes him pain in his hip and leg.  Rogers Decl. ¶ 3. Early in 2009, Rogers notified OTEC that he would be taking a medical leave of absence in order to have hip replacement surgery.  Lloyd Aff. Ex. P.  Shortly after Rogers notified OTEC of his coming operation, Putman asked Rogers how long he wanted to work at OTEC, and inquired generally about his health.  Rogers Decl. ¶ 5.  Rogers responded that he wanted to work at OTEC until he was 65, and his health was pretty good, with the exception of his upcoming surgery.  Rogers

Decl. ¶ 5. During this discussion, Putman asked Rogers if he would consider agreeing to early retirement in return for monetary consideration (a "buyout"). Rogers Decl. ¶ 5. Rogers said he would consider a buyout, but no further action was taken by either party to effectuate an agreement. Rogers Decl. ¶ 5.

Rogers was on medical leave from March 29, 2009 to May 31, 2009. Rogers Decl. ¶ 6. Rogers was initially released to work light duty, and, although he walked with a cane, Rogers was able to perform his work as superintendent when he returned to work. Rogers Decl. ¶ 7. On July 1, Rogers was released to return to regular duty with no restrictions, and he remained on regular duty until he resigned. Rogers Dep. 129:1-13

While Rogers was on leave, Putman resigned his position and OTEC hired Don Jordan ("Jordan") to be the new operations manager.[2] Buehler Dep. 76:19-22. Soon afterward, Rogers alleges, OTEC employees began speaking with Rogers about his health and age. After Rogers returned from medical leave, Jordan questioned Rogers about his health three separate times. Rogers Dep. 94:1-95:12. When Rogers responded that he was fine, Jordan pressed him, asking, "are you sure?" Rogers Dep. 94:1-95:12. Also, when OTEC learned of Roger's desire to work until he was 65, Ray told another OTEC employee to encourage Rogers to retire. Lloyd Aff. Ex. MM. Further, in June, 2009, Rogers attended a graduation ceremony and had a chance encounter with Board Member Dave Baum ("Baum"). Rogers Dep. 62:14-63:25. Baum asked Rogers about his retirement plans and, upon learning that Rogers wished to work until he was 65, Baum responded, "you don't know what your health's going to be like. You should retire as soon as you can." Rogers Dep. 62:14-63:25.

---

[2] Jordan was killed in a motorcycle accident in May 2011.

Soon after he was hired, Jordan became critical of Rogers's job performance. Jordan first criticized Rogers for "dropping the ball" on a project that had been started by OTEC while Rogers was on leave. Lloyd Aff. Ex. W. Rogers believed the criticisms were unwarranted, and wrote a letter to Jordan explaining why he thought Jordan had insufficient experience to criticize his job performance. Def. Ex. D. In his letter, Rogers made references to his superiors "micro-managing," and "sneaking around like . . . coyote[s]." Def.'s Ex. D. Jordan was angered by the letter, and viewed it as a personal attack. Jordan also believed that Rogers was trying to shirk responsibility for his failures on the job. Def.'s Ex. D p. 4.

The second incident that led Jordan to criticize Rogers occurred about a month later in August 2009. A responsibility of the operations department, in which Jordan and Rogers worked, is to respond to emergency service calls that come in over the radio. Rogers Dep. 97:1-98:24. One day, Rogers notified Jordan that he would be out of the office on a work-related matter. Rogers Dep. 99:12-100:16. According to Rogers, Jordan said he would find someone to cover the radio. Rogers Dep. 100:11-16. While Rogers was gone, OTEC received an emergency call on the radio regarding a power line possibly being down. Rogers Dep. 106:9-14. The operations department was mostly empty and there were no employees to cover the radio. In reality, there was no emergency, but nonetheless, Jordan issued Rogers a verbal warning for failing to ensure the radio was covered. Lloyd Aff. Ex. W.

Later in August, Jordan met with Rogers to issue a written warning for Rogers's alleged unsatisfactory performance. Lloyd Aff. Ex. Y. Rogers thought that the warning was unwarranted because the reasons listed in the letter for its issuance were not his responsibility. Rogers Decl. ¶ 12. Accordingly, Rogers refused to sign the letter or acknowledge the warning. Rogers Decl. ¶ 13.

At that meeting, Jordan informed Rogers that he would be removed from his line superintendent position and reassigned to a different position. Rogers Decl. ¶ 13. Jordan also told Rogers not to tell his subordinates that he had been removed as line superintendent. Buehler Decl. ¶ 5.

Prior to removing Rogers as Superintendent, Jordan asked Rogers to complete a self-appraisal of his job as Superintendent. Rogers Dep. 274:3-275: 2. Rogers completed his performance self-review and asked two of his subordinates to fill out reviews of Rogers's job performance as well. Rogers Dep. 274:19-24. All three reviewers rated Rogers performance as "meet[ing] expectations" or "exhibit[ing] leadership" in all aspects of his work. Rogers Decl. Ex. 2-3.

Several days after Jordan told Rogers that he was being removed from the Superintendent position, Jordan and Buehler met with Tim Peterson ("Peterson") before Peterson resigned his regulatory compliance technician ("RCT") position at OTEC. Buehler Decl. ¶¶ 6-7. At that meeting, Peterson told Buehler and Jordan that they should give the soon-to-be empty RCT position to Rogers because he had expressed interest in it. Buehler Decl. ¶ 7. An RCT is responsible for visually inspecting power lines, often in uneven, rural terrain. Peterson Decl. ¶¶ 2-3. The job typically requires lots of walking, but an all-terrain vehicle is provided to employees to do inspections. Peterson Decl. ¶ 3.

The same day as the breakfast with Peterson, Jordan asked Rogers to "line out the crews for the day." Rogers Dep. 136:11-137:25. When Rogers met with the work crews, he told them that he would no longer be Superintendent. Rogers Dep. 153:9-154:6. At the crews' request, Rogers brought Jordan into the crew meeting. Rogers Dep. 154:5-12. Upon learning that Rogers disobeyed him by informing the crews of his demotion, Jordan became angry and told Rogers to go to his

office. Rogers Dep. 154:15-16. OTEC claims that Rogers then invaded Jordan's personal space and, upon exiting the room, stared at Jordan through the glass window in the door. Def.'s Ex. L. Subsequently, Jordan issued Rogers a written warning for insubordination. Def.'s Ex. L..

Buehler met with both Jordan and Rogers to defuse the situation. Buehler Decl. ¶ 8. After they both calmed down, Buehler offered Rogers the RCT job, and later notified Rogers that he would experience a pay cut from $93,192 per year to $73,971 per year because Rogers no longer supervised employees. Buehler Decl. ¶ 8. However, OTEC employee Bill Neilson was transferred from a Superintendent position to RCT in 2008 with no reduction in his salary. Neilson Dep. 13:4-11, Sept. 1, 2011.

Rogers hesitated, but accepted the RCT position when Buehler informed Rogers that he would be terminated if he did not accept. Rogers Decl. ¶ 13. The following day, Rogers began training with Peterson for the RCT position. Rogers Decl. ¶ 14. Rogers claims that by the end of the week, his leg hurt badly from walking so much during training. Rogers Decl. ¶ 14.

After OTEC removed Rogers as Superintendent, Jordan justified it by telling a co-worker that "Rod is old school." Schmidt Decl. ¶ 6. Further, Jordan claimed Rogers would never be able to go where OTEC was trying to go, technology wise. Schmidt Decl. ¶ 6. OTEC also justified Rogers's removal because, due to the economic recession, it experienced significant revenue declines and needed to cut costs. Buehler Decl. ¶¶ 4, 8. Buehler, therefore, eliminated Rogers's position and consolidated it into the La Grande District Line Superintendent position held by Claud Morgan, a sixty-four year-old OTEC employee. Buehler Decl. ¶ 4.

At the end of August, 2009, Rogers called a member of the board of directors to discuss his employment situation. Lloyd Aff. Ex. II, JJ. It is against OTEC policy for an employee to

circumvent the chain of command by contacting a board member to address an issue that would normally be handled by a direct superior. Lloyd. Aff. Ex. JJ. The Board informed Jordan of Rogers's contact, prompting Jordan to send a memorandum to Rogers that outlined the proper policy for addressing employment concerns. Lloyd Aff. Ex. JJ.

In early September, 2009, Rogers met with Jordan and Ray, who offered Rogers a buyout. Rogers Decl. ¶ 16. The offer stipulated that if Rogers resigned from OTEC, he would receive his Superintendent salary until the end of 2009 and a one-time payment of $22,000. Rogers Dep. 170:20-25. Rogers alleges Jordan then said that the money would help Rogers because he "might be more crippled" by age 65 when Rogers wanted to retire. Rogers Decl. ¶ 18. OTEC disputes this fact and claims Jordan never uttered "the cripple comment."

On September 14, 2009, Rogers requested and received a medical leave of absence from work. Ray Decl. ¶ 21. Rogers collected disability benefits for roughly two years and resigned his position at OTEC on April 8, 2011. Ray Decl. ¶ 21.

II. Procedural Background

On February 19, 2010, Rogers filed a complaint with the Oregon Bureau of Labor and Industry ("BOLI") that alleged the following: (1) Retaliation for taking medical leave pursuant to the FMLA; (2) retaliation for taking medical leave pursuant to the OFLA; (3) age discrimination in violation of the ADEA; (4) age discrimination in violation of OR. REV. STAT. § 659A.030; (5) disability discrimination in violation of the ADA; and (6) disability discrimination in violation of OR. REV. STAT. § 659A.112. Def.'s Ex. D.

Rogers received a notice of right to sue from BOLI on August 1, 2010, and subsequently filed this civil suit on October 26, 2010, alleging the same six claims he alleged in his BOLI complaint.

{RMD}

*Legal Standards*

I.  Motion to Strike

When ruling on a motion for summary judgment, the court may only consider evidence that is based on personal knowledge, properly authenticated, and admissible under the Federal Rules of Evidence. FED. R. CIV. P. 56(c), (e); *Block v. City of L.A.*, 253 F.3d 410, 419 (9th Cir. 2001).

At the summary judgment stage, the court is tasked with determining what evidence bears on the particular motion before it. *Kesey, L.L.C. v. Francis*, No. CV. 06-540-AC, 2009 WL 909530, at *15 (D. Or. April 3, 2009).  In doing so, the court necessarily considers all relevant evidence and excludes all irrelevant evidence from its inquiry.  *Id.*  Accordingly, to the extent that Rogers moves to exclude evidence as irrelevant, those motions are not explicitly addressed in this opinion, but instead, are implicit in the court's ruling on the motion for summary judgment.  The court will, however, resolve other objections to admissibility such as hearsay, personal knowledge, etc. *Id.*

II.  Motion for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).  The movant has the burden of showing the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When ruling, the court must draw all reasonable inferences and view all material facts in favor of the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

Summary judgment is disfavored in employment discrimination cases "because the ultimate question is one that can only be resolved through a 'searching inquiry' – one that is most appropriately conducted by the factfinder upon a full record." *Schnidring v. Columbia Machine,*

*Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996). A motion for summary judgment should be denied if a rational trier of fact could find that the employer's action was discriminatory. *Id.*

*Discussion*

## I. Motion to Strike

Rogers moves to strike the following evidence from the record: (a) Evidence regarding OTEC employees George Peacock and Robin Stone; (b) OTEC exhibits B, C, P, Q, and R; (c) portions of Buehler's Declaration; (d) portions of Ray's Declaration; and (e) OTEC exhibits G and H. As a preliminary matter, OTEC concedes the inadmissibility of evidence regarding George Peacock and Robin Stone. Regardless, this is irrelevant evidence not considered by the court in deciding the motion for summary judgment.

### A. *Exhibits B, C, P, Q, and R.*

Rogers asks the court to exclude OTEC Exhibits B, C, P, Q, and R because affiants Buehler and Ray lack personal knowledge of the subject matter contained therein. Exhibits B, C, P, Q, and R are memoranda created by Kissell expressing his dissatisfaction with Rogers's job performance. OTEC argues that Ray, as director of human resources, gained personal knowledge of these exhibits by reviewing Rogers's personnel records, which fall into the business records hearsay exception.

An affiant can obtain personal knowledge of events and actions that the affiant did not personally witness by reviewing pertinent records. *Wash. Cent. R. Co. v. Nat'l Mediation Bd.*, 830 F.Supp. 1343, 1353 (E.D. Wash.1993). Documents reviewed in order to gain personal knowledge are often hearsay; thus, testimony regarding the contents of records is admissible only if the records fall within a hearsay exception. FED. R. EVID. 802.

Evidence falls under the business records hearsay exception when it was: (1) made

Page 11 - OPINION AND ORDER                                          {RMD}

contemporaneously to the events discussed therein; (2) made or transmitted by an individual with personal knowledge; (3) kept in the course of a regularly conducted business activity; and (4) accompanied by supporting testimony. *Clark v. City of L.A.*, 650 F.2d 1033, 1036-37 (9th Cir. 1981); FED.R.EVID. 803(6).

All of the requirements for the business records exception are met. These exhibits were made contemporaneously to the events discussed. These records were all created between November, 2004, when Kissell first became critical of Rogers's work, and September, 2007, when Kissell and Stewart terminated Rogers from OTEC. These records were also made and transmitted by an individual with personal knowledge. Kissell, as Rogers's supervisor, had personal knowledge of Rogers's job performance. These memoranda were also kept in the course of a regularly conducted business activity. Businesses often keep disciplinary memoranda in written form to keep track of disciplinary activities. That these memoranda were kept in the regular course of business by OTEC is also evidenced by similar memoranda written by Jordan in 2009 that documented the disciplinary warnings he issued to Rogers. Finally, Ray's supporting testimony accompanies the information. In her reply declaration, she writes, "[a]s Director of Human Resources for OTEC, I do have personal knowledge that [Exhibits B, C, P, Q, and R] are personnel records that are made and kept in the regular course of OTEC's regularly conducted business activity and are routinely relied on by OTEC in that business activity." Ray Reply Decl. ¶ 10.

Because Ray has personal knowledge of subject matter contained in records that fall within a hearsay exception, OTEC's exhibits B, C, P, Q, and R are admissible evidence.

B. *Buehler's Declaration.*

Rogers also moves to strike the following portion from Buehler's declaration: "During the

breakfast, Mr. Peterson stated that Mr. Rogers had been asking questions about the duties of the RCT position that Mr. Peterson would be vacating, and that Mr. Rogers had expressed interest in that position. Mr. Peterson told Mr. Jordan and I that we should give the RCT position to Mr. Rogers." Buehler Decl. ¶7. Rogers argues that this statement is hearsay. OTEC, however, contends that Peterson's comments do not constitute hearsay because they are not offered to prove the truth of the matter asserted. The court finds OTEC's argument persuasive.

Hearsay is an out of court statement offered to prove the truth of the matter asserted. FED. R. EVID. 801(c). Peterson's statements, though, are not offered to prove that Rogers wanted to be transferred to the RCT position. Whether Rogers actually desired the RCT position is irrelevant to the court's analysis. Instead, Peterson's statements are offered to show the effect they had on Buehler; specifically, that Buehler subjectively believed Rogers wanted to be transferred to the RCT position. Rogers's motion to strike portions of Buehler's declaration is denied.

### C. *Ray's Declaration*

Rogers moves to strike the following sections from the Declaration of Debby Ray:

In 2007, Mr. Rogers was fired by General manager Cliff Stewart and Operations Manager Ken Kissell because they believed Mr. Rogers' [sic] job performance was unsatisfactory. (Ray Decl. ¶ 8.)

During his first few weeks on the job, Mr. Jordan assessed his subordinates and became dissatisfied with, and critical of the quality of Mr. Rogers' [sic] job performance. (Ray Decl. ¶ 13.)

Rogers argues that these statements are inadmissible hearsay or, alternatively, that Ray has no personal knowledge of the statements.

The two excerpts in Ray's declaration do not constitute hearsay. Ray does not mention any "statement" or "assertion" made by Stewart, Kissell, or Jordan. She only asserts facts that relate to

actions taken by those individuals. Accordingly, the proper objection is lack of personal knowledge. As discussed previously, however, Ray, as OTEC's director of human resources, gained personal knowledge of the aforementioned events through review of Rogers's personnel file which falls under the business records hearsay exception.

Regardless, the court may deny a motion to strike when the information contained in the challenged portion of the record appears elsewhere on the record without objection. *See Ryan v. Patterson Dental Supply, Inc.,* No. CV–98–1177–ST, CV–98–1177–HA, 2000 WL 640859, at *9 (D. Or. May 12, 2000) ("Because the evidence is found elsewhere in the record without any objection by [Plaintiff] as to prejudice or hearsay, this motion is denied.")  Here, the information contained in ¶ 8 of Ray's Declaration appears in Rogers's deposition at 59:9-13 and 194:11-19, and the information contained in ¶ 13 appears in OTEC Exhibits E, and I-L, and again in Rogers's declaration at ¶12. Accordingly, the motion to strike is denied.

D. *Exhibits G and H*

Finally, Rogers moves to strike OTEC Exhibits G and H because they are inadmissible hearsay or alternatively, because Ray lacks personal knowledge of the contents of those exhibits. Exhibits G and H are copies of emails written regarding the events that led Jordan to issue his first two disciplinary warnings to Rogers.  OTEC argues that these emails are admissible under the business records exception to the hearsay rule.

Ray wrote in her reply declaration, "I do have personal knowledge that [Exhibits G and H] are personnel records that are made and kept in the regular course of OTEC's regularly conducted business activity . . ." Ray Decl. ¶13. By contrast, Ray writes in ¶ 11, "I have personal knowledge that this fact is shown in OTEC's personnel records . . ." The court notes that Ray is claiming not

only that the emails were present in the personnel files, but that the emails themselves qualify as personnel records.

Courts are in disagreement on whether emails can and should fall under the business records hearsay exception. Emails do not fit neatly into the business records exception. The rationale behind the business records exception is that there is an assumption that records containing information necessary to efficiently run a business will be accurate and reliable. *U.S. v. Miller*, 830 F.2d 1073, 1077 (9th Cir. 1987). Email is a casual form of communication that does not hold the same expectation of trustworthiness as other records usually kept in the course of business.[3] The fact remains, however, that as businesses look to communicate in a cheaper and more efficient manner, formal memoranda and paper communication increasingly have given way to email and other electronic media.

In *Monotype Corp. PLC v. International Typeface Corp.*, the Ninth Circuit held that emails were not automatically admissible under the business records hearsay exception. 43 F.3d 443, 450 (9th Cir. 1994). The court reasoned that "E-mail is far less of a systematic business activity than" other computer generated business records. *Id.* However, the manner in which businesses utilize email has changed drastically in the eighteen years since *Monotype* was decided. In fact, in recent years, district court judges within the Ninth Circuit have found emails to be admissible under the

---

[3]"There is neither a formal nor a principled reason why email messages could *not* satisfy the exception, but the medium in its most common use seems close to the telephone in casual and spontaneous informality, and far removed from systematic and permanent recordkeeping. Unless email were adapted to permanent and more systematic recordkeeping purposes, it seems likely that the content of email messages will fail to satisfy the "regular practice" requirement of the exception and the casual . . .nature of such messages surely raises trustworthiness concerns under FRE 803(6)." 4 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 446 (2d ed. Supp. 2005).

business records exception, albeit without much analysis. *E.g., Ionian Corp. v. Country Mut. Ins. Co.*, No. 3:10–cv–0199–ST, 2011 WL 6070442, at *2, *18 (D. Or. Dec. 2, 2011) (admitting emails as business records); *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. C–08–05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) ("[Plaintiff] laid a foundation at trial establishing that the email was admissible under the business record exception to the hearsay rule."); *Age Group Ltd. v. Regal West Corp.*, No. C07-1303BHS, 2008 WL 4934039, at *2-3 (W.D. Wash. Nov. 14, 2008) (excluding email evidence, but only because the proponent failed to lay the foundation to qualify the emails as business records).

Other district courts have closely analyzed emails under the business records exception to implement the exception's purpose. One such case that sets forth a straightforward and coherent test to determine whether emails constitute business records within the meaning of rule 803(6) is *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mex., on Apr. 20, 2010*, MDL No. 2179, 2012 WL 85447, at *3 (E.D. La. Jan. 11, 2012). There, the court explained:

> First of all, the email must have been sent or received at or near the time of the event(s) recorded in the email. Thus, one must look at each email's content to determine whether the email was created contemporaneously with the sender's acquisition of the information within the email. Second, the email must have been sent by someone with knowledge of the event(s) documented in the email. This requires a particularized inquiry as to whether the declarant—the composer of the email—possessed personal knowledge of the information in the email. Third, the email must have been sent or received in the course of a regular business activity, which requires a case-by-case analysis of whether the producing defendant had a policy or imposed a business duty on its employee to report or record the information within the email. Fourth, it must be the producing defendant's regular practice to send or receive emails that record the type of event(s) documented in the email. This would require proof of a policy of the producing defendant to use email to make certain types of reports or to send certain sorts of communications; it is not enough to say that as a general business matter, most companies receive and send emails as part of their business model. Fifth, a custodian or qualified witness must attest that these conditions have been fulfilled—which certainly requires an email-by-email inquiry. Lastly, the objecting defendant is permitted under the rule to argue that the

particular email should be excluded due to concerns of lack of trustworthiness, based on the information source underlying the email content or the circumstances under which the email was sent and received. Clearly, there is no across-the-board rule that all emails are admissible as business records.

*Id.* (Footnotes omitted).

In *Lorraine v. Markel Am. Ins. Co.* Magistrate Judge Grimm of the District of Maryland also sets a high bar for the specificity required of testimony accompanying evidence a proponent wishes to admit under Rule 803(6). 241 F.R.D. 534, 545-46 (D. Md. 2007). He writes:

> It is necessary, however, that the authenticating witness provide factual specificity about the process by which the electronically stored information is created, acquired, maintained, and preserved . . . as opposed to boilerplate, conclusory statements that simply parrot the elements of the business record exception to the hearsay rule.

*Id.* Judge Grimm justifies this stance by noting that courts' approaches to emails under the business records exception vary widely, and "[b]ecause it can be expected that electronic evidence will constitute much, if not most, of the evidence used in future motions practice or at trial, counsel should know how to get it right on the first try." *Id.* at 585. *See Also, In re Vee Vinhnee*, 336 B.R. 437, 445 (9th Cir. BAP 2005) (The increasing complexity of computer technology requires a more precise focus because electronic documents are easier to alter after creation); *State of N.Y. v. Microsoft*, No. CIV A. 98–1233(CKK), 2002 WL 649951, at *14 (D.C.C. Apr. 12, 2002) (to establish a proper foundation, the proponent must establish that the maker and all other participants in the email chain acted in the regular course of business).

The practice of generating and systematically retaining email varies significantly among business entities based on their size, sophistication, and policy. Notwithstanding, the ubiquitous nature of emails that Judge Grimm recognizes inevitably requires the court to admit emails as evidence in a variety of cases. Holding emails to some standard under the business records hearsay

exception, as opposed to broadly accepting them as admissible business records, is the best approach. Accordingly, this court adopts the test articulated in *Deepwater Horizon* and will now apply it to Exhibits G and H.

Applying this test, OTEC has not carried its burden. In Ray's affidavit, she declares, "I do have personal knowledge that [Exhibits G and H] are personnel records that are made and kept in the regular course of OTEC's regularly conducted business activity and are routinely relied on by OTEC in that business activity." Ray Reply Decl. ¶13. Ray does not articulate whether the individuals sending the email have personal knowledge of the events discussed therein; does not put forth evidence of a policy that imposed a business duty on OTEC employees to send and retain emails. Further, Ray did not analyze the applicability of the test on an email-by-email basis. Beyond Ray's declaration, there is not enough evidence on the record to declare the emails business records.

Further, Exhibits G and R can be distinguished from Exhibits B, C, P, Q, and R that the court has already found fall within the business records exception because, while Ray describes those memoranda in similar terms ("those Exhibits are personnel records"), Exhibits B, C, P, Q, and R were formal memoranda issued in conjunction with disciplinary action and performance reviews pertaining to one individual (Rogers). Disciplinary memoranda are designed to be a formal record of disciplinary problems and carry a stronger presumption of accuracy and reliability than email, which is an informal mode of communication that is not inherently reliable. Accordingly, Rogers's motion to strike Exhibits G and R is granted.

## II. Motion for Summary Judgment

### A. *Age Discrimination*

OTEC first seeks summary judgment on Rogers's age discrimination claims. Under the

ADEA and Oregon state law, it is unlawful for an employer to discriminate against an employee in employment decisions "because of [an] individual's age." 29 U.S.C. §§ 621-634; OR. REV. STAT. § 659A.030 . Courts have interpreted the statutes' "because of" language to require a plaintiff to prove age was a but-for cause of an adverse employment decision. *Gross v. FBL Fin. Serv., Inc.*, 557 U.S. 167, 129 S.Ct. 2343, 2350 (2009). That age must be a but-for cause of an employment decision does not require that age be the sole motivation for the employer's actions. *Cancellier v. Federated Dept. Stores*, 672 F.2d 1312, 1316 (9th Cir. 1982). Other factors like discipline may also factor in to the employer's decision. *Id.* Instead, "age must 'make a difference' between termination and retention of the employee in the sense that, but-for the presence of age discrimination, the employee would not have been discharged." *Id.*

Rogers argues that the "but-for" test does not apply to the state age discrimination claim, but urges the court to apply a test whereby he can succeed in his claim if age was a "substantial factor" in the adverse employment decision. In *Morrow v. Bard Access Sys., Inc.*, another judge in this district applied the "substantial factor" test to a state age discrimination case. No. 3:10–CV–00209–JO, 2011 WL 2471525, at *2 (D. Or. June 20, 2011). Unlike the ADEA, which only covers age discrimination, OR. REV. STAT. § 659A.030 makes unlawful age, race, and religious discrimination, to which Oregon courts apply the "substantial factor" test. *Id.* The *Morrow* court reasoned that it would be anomalous to apply different standards to types of discrimination that are all covered by the same statutory provision. *Id.*

However, in *Ogden v. Bureau of Labor*, the Oregon Supreme Court upheld the Oregon Court of Appeals' decision to apply the but-for test to a state age discrimination claim. 68 Or.App. 235, 243 (Or. App. 1984), *aff'd in rel part*, 299 Or. 98 (1985). There, the court rejected the employer's

argument that it should apply the sole causation standard, holding that "the legislature meant to prohibit the use of age as a determining factor," and, "[t]he critical issue is whether . . . age made a difference." *Id.* at 244-45. The Oregon Supreme Court, despite finding the term "but-for causation" ambiguous, affirmed, holding that the court must determine whether "age in fact caused the unfavorable treatment." 299 Or. 98, 103 (1985) (internal quotation marks omitted). In addition, Oregon courts use federal interpretations of the ADEA to inform the interpretation of the state age discrimination statute. *Id.* at 243; *Clackamas Fire Protection Dist. No. 1 v. Or. Bureau of Labor and Indus.*, 50 Or.App. 337, 349 (Or. App. 1981). Because federal courts are bound to follow the decision of the state's highest court when interpreting state law, this court applies the but-for causation test to both the ADEA and Oregon state age discrimination claims. *Peck v. AT&T Mobility*, 632 F.3d 1123, 1125 (9th Cir. 2011).

OTEC argues that Rogers cannot prove but-for causation because Rogers testified in his deposition that the adverse employment action was taken because of three "equal reasons": (1) his age; (2) his hip condition; and (3) the fact that he took medical leave. This argument fails for two reasons. First, OTEC conflates but-for causation with sole causation. For a plaintiff to succeed in an age discrimination case, age must be a determining factor, not the only factor. Further, OTEC bases its argument on Rogers's subjective beliefs as expressed in his deposition. The actual motivation of the employer, not the subjective belief of the employee, is all that is relevant in an employment discrimination case. Rogers, therefore, may still succeed in his age discrimination case despite asserting disability discrimination and discrimination because of medical leave.

A plaintiff can prove a case of employment discrimination by introducing direct evidence or indirect evidence. *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996). If the

Page 20 - OPINION AND ORDER                                                    {RMD}

plaintiff establishes a prima facie case by introducing direct evidence, he has necessarily raised a genuine issue of material fact, and the court's analysis is at an end. *Shelley v. Geren*, 666 F.3d 599, 615 (9th Cir. 2012). If, however, the plaintiff relies on indirect evidence, the court applies a burden-shifting test articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

### 1. Direct evidence

Rogers first contends that summary judgment is improper because he can prove his case through direct evidence. OTEC argues that his evidence is not direct evidence, and the court should instead apply the burden-shifting approach.

"Direct evidence is evidence 'which, if believed, proves the fact [of discriminatory animus] without inference or presumption," and "typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005). Direct evidence is rare, and usually arises only when the employer admits to having a discriminatory motive. *Id.*

In *Dossat v. Hoffman-La Roche Inc.*, the District of Nevada held that a supervisor's comments that the plaintiff was "old school," not a proper fit for the "new environment," and made comments about retiring was sufficient evidence to demonstrate pretext.       No. 2:09–CV–00245–KJD–PAL, 2011 WL 1299621, at *1, *4-5 (D. Nev. March 31, 2011). However, in *Culver v. Qwest Comm. Corp.*, another judge in this district found statements referring to the plaintiff as "old man," "old man of the crew," and "old school" were not direct evidence because they require an inference to find them discriminatory. No. 05-CV-1720-HU, 2007 WL 963446, at *12 (D. Or. March 23, 2007) *aff'd*, 306 Fed.Appx. 403, 405 (9th Cir. 2009). There, the court reasoned, "the comments could be references to an employee's chronological age, they could also

{RMD}

refer to employees with longer tenure or to those who cling to outdated ideas." *Id.* at *12.

Rogers argues that two comments made by Jordan constitute "direct evidence" of age discrimination. First, Plaintiff claims Jordan told a co-worker, "Rod is old school," and "would never have the ability to go where [OTEC] is looking to go technology wise." Second, Rogers claims Jordan wrote on Rogers's performance review, "Rod needs to step up to changing times."

Jordan's remarks are not direct evidence of age discrimination. To say that someone is "old school" is not the type of clearly discriminatory language normally classified as direct evidence. Like the remarks in *Culver*, Jordan's comments are susceptible to multiple interpretations, and to view Jordan's comments as evidence of age discrimination, one must make an inference or presumption regarding the meaning behind the words. A more direct interpretation of Jordan's remarks is that he believes Rogers "cling[s] to outdated ideas," and is not technologically savvy. Accordingly, the court considers Jordan's comments only as indirect evidence under the burden-shifting analysis.

2. Indirect Evidence.

When a plaintiff seeks to prove age discrimination through indirect evidence, courts apply the burden shifting framework articulated in *McDonnell Douglas*, 411 U.S. at 802. Under this test, the plaintiff first creates a presumption of discrimination by establishing a prima facie case. *Id.* Once a prima facie case is established, the burden shifts to the defendant to produce legitimate non-discriminatory reasons for the adverse employment action. *Id.* at 803. The burden then shifts back to the plaintiff to show that the defendant's proffered legitimate reasons are pretext for discriminatory motive. *Id.*

a. Prima facie case

To establish a presumption of discrimination, a plaintiff must show the following: (1) he is over the age of 40; (2) his job performance was satisfactory; (3) he was the victim of an adverse employment action; and (4) he was replaced by someone significantly younger who holds equal or inferior qualifications. *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 917 (9th Cir. 1997). The plaintiff need not produce much evidence to carry his burden at this step. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). The amount of proof necessary to establish a prima facie ADEA case on summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Id.*

OTEC does not dispute the first and third elements -- that Rogers is over forty and was the victim of an adverse employment action. It does, however, argue that Rogers's job performance was unsatisfactory and that Rogers was not replaced by someone significantly younger than him.

If the plaintiff puts forth evidence of satisfactory work performance, the court must assume that performance was satisfactory for summary judgment purposes. *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 659-60 (9th Cir. 2002). Positive subjective evaluations of the plaintiff's work performance by the plaintiff and the plaintiff's subordinates are not sufficient to establish a genuine issue of material fact, but at the prima facie stage, where the evidentiary burden is low, the court may take the plaintiff's subjective evaluation into account. *Id.* at 660.

Here, Rogers introduces sufficient evidence to carry his burden. First, Rogers offers three different work evaluations completed in 2009 by him and subordinates Tim Banister and Tony Hellbusch. In those evaluations, Rogers was rated as "Meet[ing] expectations" or "exhibit[ing] leadership" in all aspects of his work. Rogers Decl. Ex 2. Second, Rogers was presented with the Employee of the Year award in 2005. Third, OTEC gave Rogers a raise and a lump-sum payment

in 2007 after he was rehired by the Board. Finally, in 2008, Putman offered Rogers the John Day Superintendent position in addition to his responsibilities as Baker Superintendent because of Rogers's "knowledge and experience of how OTEC operated." Rogers Decl. ¶ 4.

OTEC, conversely, argues that Rogers's job performance was unsatisfactory. In its briefs, OTEC paints a picture of a worker who has been disciplined constantly since his hiring. Beyond the criticisms piled upon Rogers by Jordan and Buehler, OTEC notes that Rogers's first supervisors, Kissell and Stewart, placed Rogers on a performance improvement plan, criticized his job performance, reprimanded him repeatedly, and suspended him from work for two days before ultimately firing him from OTEC in September 2007.

Given the low evidentiary threshold imposed on the first step of the test and the court's duty to view the evidence in the light most favorable to the nonmoving party, the court finds that Rogers adequately demonstrated that his job performance was adequate.

OTEC argues that Rogers cannot satisfy his burden on the final element because the worker who replaced Rogers in the Superintendent position was only two years younger than Rogers. The court agrees that, facially, Rogers cannot satisfy his burden on this element of the prima facie test.

The fourth element of the prima facie case, however, is flexible. "[F]ailure to prove replacement by a younger employee is 'not necessarily fatal' to an age discrimination claim where the discharge results from a general reduction in the work force due to business conditions." *Nidds*, 113 F.3d at 917, *quoting Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1421 (9th Cir. 1990). Alternatively, "courts require instead that the plaintiff show thorough circumstantial, statistical, or direct evidence that the discharge occurred under circumstances giving rise to an inference of age discrimination." *Id.* OTEC alleges that, due to a downturn in revenue, it demoted Rogers and

consolidated the Baker District line superintendent position into the La Grande District line superintendent position as a cost-cutting measure. Therefore, Rogers can still show a prima facie case if he can introduce evidence that gives rise to an inference of discriminatory motive.

Rogers introduces three arguments he claims raise an inference of discriminatory motive. First, Rogers argues that OTEC and its agents repeatedly tried to convince him to retire. After Buehler and Ray learned of Rogers's desire to work until he was 65, Ray told the benefits specialist to encourage Rogers and another employee to retire. In one email, Ray writes, "Werner is now interested in a SERP or a retirement package to offer to [redacted] and Rod Rogers. Rod is 62 and [redacted] is 65." (Pl.'s Exhib. MM.) Rogers also alleges that while speaking with Baum at a graduation ceremony, he told Baum that he wanted to work until he was 65. Baum allegedly responded, "you don't know what your health's going to be like. You should retire as soon as you can." Pl. Depo 63:2-4.

OTEC argues this is not evidence of age discrimination. Instead, they argue, Buehler and Ray suggested that the benefits specialist encourage Rogers to retire because Buehler was dissatisfied with the quality of Rogers's work and wanted to amicably remove him from OTEC. Further, OTEC argues that Baum's comments were stray remarks and should be stricken from the record as irrelevant.

"Stray remarks" are comments that are made in an ambivalent manner that have no connection with the allegedly discriminatory employment action. *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993). In *Nesbit*, plaintiffs alleged age discrimination based in part because one of their superiors remarked, "[w]e don't necessarily like grey hair." *Id.* The Ninth Circuit held that it was an ambivalent stray remark and was, at best, weak circumstantial evidence of age

{RMD}

discrimination. *Id.*

Here, Baum's remarks at the graduation ceremony do not even rise to the level of the remark in *Nesbit*. First, Baum's comments were made in a cordial manner in a social setting. The two were at a graduation ceremony, and Rogers described their relationship as being friendly. Rogers Dep. 56:20-23, 57: 9-11. Further, Baum had no involvement with the decision to demote Rogers and cut his pay. Thus, Baum's comments were ambivalent stray remarks that had no connection to the adverse employment action and are irrelevant to our inquiry.

Third, Rogers argues that the discipline he received was unwarranted. The verbal and written warnings, he argues, were predicated on actions that were not his responsibility. Even if the court were to assume that the discipline was baseless, the wisdom of disciplinary actions is not for the court to judge. As the Ninth Circuit held:

> In judging whether [the defendant's] proffered justifications were "false," it is not important whether they were objectively false . . . Rather, courts "only require that an employer honestly believed its reason for its actions, even if its reason is 'foolish or trivial or even baseless.'

*Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1063 (9th Cir. 2002). Rogers has not introduced any evidence indicating that Jordan and Buehler were disciplining Rogers in bad faith.

Finally, Rogers alleges that in 2008, OTEC demoted Bill Neilson, a 54-year-old OTEC employee, from Superintendent to RCT without cutting his pay. In fact, OTEC transferred nineteen employees between June 2009 and March 2010. Seventeen of the nineteen were over forty years old and twelve were over fifty years old. Rogers was the only employee to receive a pay cut. This, OTEC argues, shows that they do not engage in age discrimination, but the reasons for the pay cut

were specific to Rogers.[4]

As for Rogers's comparator evidence, it is true that Neilson is in the same protected class as Rogers (individuals over 40 years of age), but that does not strip this evidence of probative weight. "In an age discrimination case, comparison with younger employees within the protected class is not improper as a matter of law." *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1116 (9th Cir. 2011). Unlike race, religion, or sex discrimination, where specific traits separate protected classes, age is a continuum, and each individual's standing within that class is relative. *Id.* Neilson is only eight years younger than Rogers, but still well within the class of protected individuals. Nonetheless, that OTEC cut Rogers's pay while not cutting the pay of an individual nearly a decade his junior could raise an inference of age discrimination for the purposes of the fourth prima facie element.

Viewing all the evidence in the light most favorable to the plaintiff, Rogers has met his initial prima facie burden.

### b. Legitimate reasons

Because Rogers established a prima facie case of age discrimination, the burden of production shifts to OTEC to demonstrate non-discriminatory reasons for its actions. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). When a defendant shows legitimate reasons for the employment decision, the presumption of discrimination created by the prima facie case "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510 (1993).

OTEC advances three legitimate nondiscriminatory reasons for the adverse employment

---

[4]Rogers also argues that discriminatory animus is evidenced by the fact that, on several occasions, OTEC offered Rogers a "buyout" or retirement package and never followed through to complete the deal. Beyond the fact of the buyout offer, it is not clear why Rogers construes the buyout negotiations as evidence of age discrimination.

{RMD}

actions.  First, OTEC alleges that it disciplined Rogers because his job performance was unsatisfactory.  Jordan issued Rogers three disciplinary warnings because Jordan believed Rogers produced unsatisfactory work and acted in an insubordinate manner.  Second, OTEC claims that Buehler needed to cut OTEC's costs and removed Rogers from his position because Buehler believed Rogers was interested in the RCT position, and "Buehler was trying to find a situation where [Rogers] could be successful."  Buehler Decl. ¶ 4.  Finally, OTEC claims it cut Rogers's pay because OTEC was trying to cut costs and, since Rogers no longer supervised employees, was no longer entitled to receive such a high salary.

### c. Pretext

The burden of production now shifts back to Rogers to demonstrate that OTEC's nondiscriminatory justifications are pretext for discriminatory motives.  A plaintiff can demonstrate pretext "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang v. Univ. of Calif. Davis Bd. Of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000).  When the plaintiff relies on indirect evidence, he must produce "specific, substantial evidence of pretext." *Wallis*, 26 F.3d at 890, *quoting Steckl v. Motorola, Inc.,* 703 F.2d 392, 393 (9th Cir. 1983).  When the plaintiff introduces evidence that consists of more than the *McDonnell Douglas* prima facie presumption, they have necessarily demonstrated a genuine issue of material fact, and summary judgment is not appropriate. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004).

First, Rogers argues that OTEC's changing rationales for his demotion demonstrate sufficient evidence to survive summary judgment.  Rogers claims that first OTEC represented the demotion

{RMD}

as disciplinary, but later claimed Rogers requested the new assignment, and even later, labeled the demotion as a cost-cutting measure.

"[F]undamentally different justifications for an employer's action . . . give rise to a genuine issue of fact with respect to pretext since they suggest the possibility that neither of the official reasons was the true reason." *Aragon*, 292 F.3d at 661, *quoting Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir.1994). In *Aragon*, an employee was laid off because of a seasonal downturn in business and also because of his poor job performance. *Id*. The Ninth Circuit held that these two rationales were not inconsistent or fundamentally different. *Id*. Further, it is reasonable that when a company needs to eliminate positions for economic reasons, they would take into account job performance when selecting the employee to demote or eliminate. *Id*.

Here, OTEC's stated justifications for the adverse employment action are not inconsistent. Like the employer in *Aragon*, OTEC was eliminating jobs in order to cut costs due to decreased revenue. Also like the employer in *Aragon*, OTEC took job performance into account when deciding what positions would be eliminated. Due to Rogers's disciplinary record, Jordan and Buehler likely thought it reasonable to demote Rogers as opposed to another superintendent with a superior work record. Accordingly, OTEC's stated reasons are not inconsistent and Rogers's argument does not demonstrate pretext.

Second, Rogers alleges that OTEC's claim that they were required to eliminate Rogers's position due to revenue decline is pretextual because OTEC spent significant sums of money following Rogers's removal on building projects. OTEC counters with two arguments. First, OTEC claims that the projects specified by Rogers were "capital projects" that were paid for in a different manner than employee wages. Next, OTEC explains that these projects were inevitable cost-saving

projects and were performed during the economic downturn to take advantage of low-interest-rate loans and low construction costs. OTEC's expenditures following Rogers's demotion do not demonstrate a genuine issue of material fact on the issue of pretext.

Third, Rogers argues that OTEC's rationale that Rogers had expressed interest in the RCT is pretext. In support, Rogers points to Peterson's declaration where he says, "it was obvious at that point that they were going to remove Rodney from his superintendent position," and he "thought it would be better than Rodney losing his job." Peterson Decl. ¶ 4. Further, Rogers claims that when he expressed his interest in the RCT position to Peterson, he was joking. This evidence, however, is irrelevant. Only the subjective motive of the supervisor is relevant to whether OTEC's justifications are pretextual to a discriminatory motive. Rogers has not put forth any evidence to rebut OTEC's claim that Jordan and Buehler subjectively believed Rogers wanted the RCT position.

Finally, Rogers claims that OTEC's reliance on poor job performance as grounds to make the adverse employment decision is pretext because: (1) his instances of discipline in 2007 are irrelevant to the demotion; (2) Butner and Putman's criticisms, on which OTEC relies, are conclusory statements that are not supported by the facts; (3) Buehler had no personal knowledge of Rogers's performance, so his statement that "Rogers was the poorest performer among OTEC's three Line Superintendents" is baseless; and (4) Rogers's actions after his demotion are irrelevant to the adverse employment action. However, even if the court assumes the truth of his assertions, Rogers fails to demonstrate the existence of a genuine issue of material fact. The wisdom of disciplinary action taken by an employer is not for the court to judge, and Rogers introduced no evidence to rebut OTEC's assertion that Buehler and Jordan subjectively believed Jordan deserved to be disciplined and demoted.

Because there is no genuine issue of material fact and OTEC is entitled to judgment as a matter of law, OTEC's motion for summary judgment on Rogers's age discrimination claims is granted.

B. *Discrimination Based on Medical Leave.*

Rogers also brings suit alleging OTEC interfered with his rights under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601-2654 ("FMLA"), and the Oregon Family Leave Act, OR. REV. STAT. §§ 659A.150-659A.186 ("OFLA"). OTEC argues it is entitled to summary judgment on both the FMLA and OFLA claims.

1. Procedural Objections

Before reaching the merits of Rogers's claim, OTEC brings several procedural arguments in favor of summary judgment. First, OTEC argues that Rogers has, in essence, moved for leave to amend his complaint -- the granting of which would be improper. Next, OTEC contends that summary judgment should be granted in its favor on Rogers's OFLA claim because the facts of his case do not lend themselves to interference claims as defined in OFLA. Finally, OTEC argues it is entitled to summary judgment on the OFLA claim because Rogers's claim violates the statute of limitations.

a. FMLA - motion for leave to amend

First, OTEC argues Rogers, in recasting his claim as an "interference claim," is attempting to add a "new" claim to his complaint -- something the court should disallow.

The FMLA confers two separate rights to covered individuals. First, it guarantees covered employees the right to take leave when suffering from a serious medical problem, to care for an ill family member, or to care for a newborn child, among other reasons. 29 U.S.C. § 2612(a)(1). It also

grants employees the right to return to their previous position after taking protected leave without detrimental consequences. 29 U.S.C. § 2612(a)(2).

Two causes of action can arise if an employer violates rights provided by the FMLA. An "interference" claim arises when an employer interferes with, restrains, or denies an employee the exercise of his or her rights under the act. 29 U.S.C. § 2615(1)(a). This cause of action includes situations where an employer takes an adverse employment action against an employee for requesting or actually taking protected leave.[5] A retaliation claim, on the other hand, arises only when an employer discharges or otherwise retaliates against an employee who opposes an employer practice made unlawful by the FMLA. 29 U.S.C.A. § 2615(1)(b).

The distinction between interference and retaliation claims is important because the court applies a different standard to each. In the Ninth Circuit, a plaintiff may sustain an interference claim if the employer used the plaintiff's protected leave as a "negative factor" in an adverse employment decision. *Bachelder v. Am. W. Airlines, Inc.,* 259 F.3d 1112, 1125 (9th Cir. 2001); 29 C.F.R. § 825.220(c). The Ninth Circuit has reserved judgment on what test district courts should apply to retaliation/discrimination claims. *Xin Liu v. Amway Corp.,* 347 F.3d 1125, 1136 n.10 (9th Cir. 2003). The recent practice in the District of Oregon, however, is to apply the *McDonnell Douglas* burden-shifting framework to retaliation/discrimination claims. *Price v. Multnomah Cnty.,* 132 F.Supp.2d 1290, 1296 (D. Or. 2001).

In Rogers's complaint, he pleads a retaliation cause of action. In Rogers's memorandum in

---

[5]Although traditional notions of employment retaliation include situations where an employer takes an adverse employment action in response to an employee asserting some legally protected right, under the FMLA a scenario like this constitutes interference instead of a retaliation.

opposition, however, Rogers argues that his claim is for interference. OTEC contends that since

Rogers labeled his FMLA/OFLA claim as one for retaliation in his complaint, Rogers is trying to

avoid summary judgment by amending his complaint to add a claim for interference. OTEC argues

that this "motion" should be denied because it would be prejudiced in two ways if the court allowed

Rogers to proceed under this "new" claim. First, OTEC argues it has not had an opportunity to

perform discovery on the interference claim. Second, OTEC argues that it was precluded in its

opening memo from arguing that Rogers did not incur a cognizable injury.

Leave to amend is liberally granted under FED. R. CIV. PRO. 15, but a court may deny leave

to amend because of "undue delay, bad faith in seeking amendment, or undue prejudice to the party

opposing amendment." *Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1398

(9th Cir. 1986). In *Acri*, the Ninth Circuit upheld the district court's denial of leave to amend. *Id.*

The court reasoned that the movant sought amendment solely in order to avoid summary judgment,

and to allow amendment and additional discovery when discovery was nearly complete would cause

delay and prejudice to the defendant. *Id.* Thus, if Rogers's rebranding of his claim is properly

viewed as a motion for leave to amend, it is within the court's discretion to deny that motion.

Courts, however, are not bound to strictly construe a claim for relief according to a few key

words. In *Shepard v. City of Portland*, for instance, the plaintiff did not precisely identify the

provision of the FMLA under which he sought relief. No. 09–0021–AA, 2011 WL 5282607, at *7

(D. Or. Oct. 31, 2011). The plaintiff alleged the defendant "willfully discriminated against [him],

interfered with [his] efforts to take leave, deterred [him] from exercising his rights, and retaliated

against [him], in retaliation for asserting his right under the FMLA." *Id.* The court nonetheless

construed plaintiff's claim as one for interference instead of retaliation based on the facts pleaded

in the complaint. *Id.* The Ninth Circuit came to a similar result in *Bachelder,* in part because the regulation enforcing the FMLA uses the terms interference, retaliation, and discrimination interchangeably in reference to interference claims. 259 F.3d at 1124; 29 C.F.R. § 825.220(c).

Here, Rogers is not moving for leave to amend, but simply clarifying the legal theory under which he wishes to proceed. In his complaint, Rogers properly pled a claim for interference. He alleged that: (1) he took protected leave; (2) OTEC "discriminated against plaintiff because of plaintiff's protected leave . . ."; and (3) he suffered harm as a result of OTEC's actions. Compl. ¶¶ 32-34. Despite the fact that Rogers labeled this claim as one for "retaliation," it was sufficiently pled to put OTEC on notice that it would be defending against an interference claim.

In fact, OTEC appears not to have noticed Rogers's labeling mistake when it filed its motion for summary judgment. All of the arguments that OTEC introduced in its memorandum in support center around whether OTEC retaliated against Rogers for taking medical leave—not whether facts existed whereby Rogers could pursue a true retaliation/discrimination claim. If OTEC had actually construed Rogers's claim as one for retaliation or discrimination, OTEC's arguments would focus on the fact that Rogers never challenged OTEC's medical leave policies and thus could not possibly state a successful claim for discrimination or retaliation. OTEC clearly understood the nature of Rogers's claim and was not prejudiced by the introduction of a new label for that claim. Further, due to the confusing way that the implementing regulations use terms "interference," "retaliation," and "discrimination," the court should give some leeway to litigants guided by its text. 29 C.F.R. § 825.220.

The court concludes that Rogers is not attempting to state a new claim for interference, but clarifying under which theory he sought to proceed.

{RMD}

b. OFLA

OTEC argues that Rogers is barred from asserting an interference claim under the OFLA for two reasons. First, OTEC argues that OFLA's interference provision is so narrow in scope as to preclude Rogers from proceeding given the facts at hand. Second, OTEC argues that the OFLA interference claim is barred by a statute of limitations.

Provisions of the OFLA "shall be construed to the extent possible in a manner that is consistent with any similar provisions of the [FMLA]." OR. REV. STAT. § 659A.186(2). Thus, if a provision of the OFLA is "similar" to the FMLA section that provides a cause of action for interference, the court must interpret them consistently and find that the OFLA provides for FMLA-style interference claims.

The interference provision of the OFLA, makes it unlawful for an employer to "[d]eny family leave to which an eligible employee is entitled under [OFLA]." OR. REV. STAT. § 659A.183(1). In *Fillman v. OfficeMax, Inc.,* a case in this district, the court read this provision narrowly as to bar a plaintiff from bringing an interference claim, stating, "[u]nlike FMLA, OFLA does not provide a cause of action for 'interference' with an . . . employee's ability to request OFLA leave or for retaliation against an employee for having made an OFLA request." No. 05-6346-TC, 2007 WL 2177930, at *8 (D. Or. July 27, 2007).

*Fillman*, however, is not mandatory authority, and the *Fillman* court overlooked OR. REV. STAT. § 659A.183(2), which makes it unlawful for an employer to "[r]etaliate or in any way discriminate against an individual . . . because the individual . . .submitted a request for family leave or invoked any provision of [OFLA]." Despite using the terms "retaliate" and "discriminate" instead of "interfere" this provision is similar to the interference provision in the FMLA. Since provisions

of the OFLA must be construed consistently with provisions of the FMLA, the court holds that Rogers may pursue his OFLA claim.[6]

Second, OTEC argues that Rogers's OFLA claim is barred by a one-year statute of limitations. OTEC claims that even though Rogers filed a BOLI complaint on February 19, 2010, his claim is still barred because he alleged a retaliation claim, not an interference claim, in his BOLI complaint.

An employee suing an employer for employment discrimination must commence suit within one year of the unlawful employment action. OR. REV. STAT. § 659A.875(1). If an employee files a complaint with BOLI for employment discrimination, he or she must file a civil complaint within 90 days of receipt of a right to sue letter or the claim is waived. OR. REV. STAT. § 659A.875(2).

Rogers alleges in his complaint that he received a notice of right to sue from BOLI on August 1, 2010 and filed his civil complaint in this case on October 26, 2010. Only 86 days elapsed between receipt of the notice of right to sue and filing of the civil complaint. Rogers, therefore, timely filed his complaint according to OR. REV. STAT. § 659A.875.

Because OFLA recognizes Rogers claim as a cognizable one, and his claim is not in violation of the statute of limitations, the court now turns to the substantive merits of Rogers's interference claim.

### 2. Substantive Merits

To prove a case of interference Rogers must show by a preponderance of the evidence that "1) he took protected leave; 2) he was subjected to an adverse employment action; and 3) taking the

---

[6]Technically, the OFLA claim in one for "retaliation," but for efficiency purposes it will be referred to as an interference claim in the substantive analysis below.

leave was a 'negative factor' in the adverse employment action." *Shepard*, 2011 WL 5282607, at *14, *citing Bachelder,* 259 F.3d at 1125.

OTEC does not dispute the first two elements, but argues that Rogers's protected leave played no part in the adverse employment actions. In support, OTEC first offers comparator evidence. Most notably, OTEC claims that 28 other employees took medical leaves of absence and none were fired or demoted as a result. In fact, Claude Morgan, who replaced Rogers as Superintendent took two leaves of absence between 2007 and 2009 but was nonetheless promoted upon his return from leave. Second, OTEC argues that prior to his leave of absence, Rogers wrote a note indicating his belief that Buehler wanted to fire him. If Buehler wanted to fire Rogers prior to his leave, OTEC argues, the leave could not have been the motivation for any subsequent adverse employment decisions.

Rogers contends that summary judgment is inappropriate because the evidence raises a genuine issue of material fact regarding whether his protected leave was a "negative factor" in the adverse employment action. Roger's primary argument to support this proposition is that the adverse employment action was taken in such close temporal proximity to his protected leave that it necessarily raises an inference of causation.

In some cases, an inference of causation may be inferred solely by the temporal proximity between relevant actions. *Villiarimo*, 281 F.3d at 1065. "But timing alone will not show causation in all cases; rather, 'in order to support an inference of retaliatory motive, the termination must have occurred fairly soon after the employee's protected expression.'" *Id., quoting Paluck v. Gooding Rubber Co.,* 221 F.3d 1003, 1009-10 (7th Cir. 2000). In *Yartzoff v. Thomas,* the Ninth Circuit inferred causation through temporal proximity when an employer began to transfer job duties and

give bad performance reviews three months after the plaintiff engaged in a protected activity. 809 F.2d 1371, 1376 (9th Cir. 1987).

Here, temporal proximity exists between Rogers's medical leave of absence and the adverse employment actions. Rogers returned from medical leave on June 1, 2009. Three weeks later, Jordan criticized Rogers for "dropping the ball" on the Birch Street job. Within two-and-a-half months of Rogers's return from leave, OTEC disciplined Rogers twice more and removed him from the Superintendent position.

Nonetheless, Rogers does not carry his evidentiary burden. The evidence of temporal proximity is not sufficient to rebut OTEC's comparator evidence, especially considering the fact that Rogers was replaced as Superintendent by an individual who had also recently taken a protected leave of absence. Accordingly, the court grants summary judgment in favor of OTEC on Rogers's FMLA and OFLA claims.

### C. Disability Discrimination

Finally, OTEC argues that it is entitled to summary judgment on Rogers's claims for disability discrimination under the ADA and the Oregon state disability discrimination law. 42 U.S.C. §§ 12101-12300; OR. REV. STAT. §§ 659A.103-659A.145. Rogers argues that there are genuine issues of material fact regarding whether a causal connection exists between his disability and the adverse employment action and whether OTEC's proffered justifications for the adverse employment action are pretextual.

When analyzing discrimination claims under the ADA and Oregon state law, the Ninth Circuit applies the *McDonnell Douglas* burden-shifting framework. *Snead v. Metro. Prop. & Cas. Ins. Co.,* 237 F.3d 1080, 1093 (9th Cir. 2001).

Page 38 - OPINION AND ORDER                                        {RMD}

1.  Prima facie case

To prove a prima facie case of discrimination under the ADA and Oregon state law, a plaintiff must show that: (1) he is a qualified individual with a disability; (2) he suffered an adverse employment action; and (3) there was a causal connection between the adverse employment action and his disability. *Hutton v. Elf Atochem N. Am. Inc.,* 273 F.3d 884, 891 (9th Cir. 2001). The proof required at the prima facie stage for employment discrimination cases "is minimal and does not even need to rise to the level of a preponderance of evidence." *Wallis,* 26 F.3d at 889; *See also, Kinney v. Emmis Operation Co.,* 291 Fed.Appx. 789, 790 (9th Cir. 2007) (applying the standard to a case brought under the ADA).

OTEC does not contest the first two elements of Rogers's prima facie case, but asserts that no evidence exists showing a causal connection between the adverse employment action and Rogers's disability.

A causal connection exists between an adverse employment action and a disability when an action is taken "on the basis of" an individual's disability. 42 U.S.C. § 12112; OR. REV. STAT. § 659A.112. The Ninth Circuit has interpreted "on the basis of" to mean "motivated, even in part, by animus based on a plaintiff's disability . . ." *Head v. Glacier Nw. Inc.,* 413 F.3d 1053, 1065 (9th Cir. 2005). Therefore, a plaintiff may succeed in a disability discrimination claim, even if some of the employer's motivations were legitimate, so long as the employer considered the employee's disability in making an adverse decision. *Id.* at 1066.

Rogers introduces three pieces of evidence he claims indicate that his disability motivated the adverse employment action. First, he argues that after giving OTEC notice of his upcoming hip surgery, Putman questioned Rogers about his health and offered him a buyout. That Putman asked

Rogers about his health is irrelevant to whether Buehler and Jordan were motivated by Rogers's disability because Putman left OTEC long before the adverse employment decision was made.

Second, Rogers argues that Jordan questioned Rogers about his health on three separate occasions in the summer of 2009. On one occasion, in response to Rogers's answer, Jordan asked, "are you sure?" Rogers Dep. at 94:1-96:24. OTEC argues that these questions are evidence merely of a supervisor showing concern for his subordinate's well-being. Further, OTEC points out that portions of the ADA require employers to be proactive about providing accommodations to their employees. Through these questions, OTEC argues, Jordan was assessing whether accommodations would be necessary.

Finally, Rogers contends Jordan, while urging him to accept a severance offer, commented that Rogers might be "more crippled" by the time he was ready to retire at age 65. Deppo 173:16-17. OTEC claims that Jordan never made the comment, but even if he did, it was only an inquiry about whether Rogers believed he could continue working instead of evidence of a discriminatory motive. This is by far the most persuasive evidence indicating a possible discriminatory motive and verges on direct evidence of such a motive.

In light of the above evidence, Rogers satisfies the evidentiary burden to show the existence of a prima facie case of disability discrimination.

### 2. Legitimate nondiscriminatory reasons

OTEC sets forth the same three legitimate nondiscriminatory reasons for the adverse employment action as it did for Rogers's age discrimination claim: (1) unsatisfactory job performance; (2) a need to cut costs due to reduced revenues; and (3) its perception that Rogers desired to be transferred to the RTC position.

3. Pretext

To demonstrate that OTEC's proffered justifications for its actions are pretextual, Rogers relies on the same four arguments as he does for his age discrimination claim. As explained, those reasons are largely unpersuasive. However, unlike in the age discrimination claim, there exists evidence that gives rise to genuine issues of material fact for this claim.

By far the most compelling evidence is Jordan's "crippled comment," which by itself creates a genuine issue of material fact. First of all, there is a genuine factual dispute regarding whether this comment was actually made. Further, the "crippled comment" is persuasive evidence that raises a genuine issue of material fact as to whether OTEC was motivated wholly or in part by Rogers's disability, as well as whether OTEC's stated nondiscriminatory justifications are pretext.

When coupled with OTEC supervisors' repeated inquiries into Rogers's health and Buehler and Jordan's "take it or leave it" offer of a physically demanding position to Rogers despite his health problems, the evidence could lead a reasonable factfinder to conclude that OTEC engaged in discrimination based on Rogers's disability.

Because genuine issues of material fact exist in Rogers's disability discrimination claim, OTEC's motion for summary judgment is denied.

### Conclusion

Based on the foregoing reasons, OTEC's motion for Summary Judgment is GRANTED as to Rogers's age discrimination and medical leave claims, and DENIED as to Rogers's disability discrimination claims. Further, Rogers's motion to strike is GRANTED in part and DENIED in part.

Dated this 8th Day of May, 2012

JOHN V. ACOSTA
United States Magistrate Judge